# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 3, 2010 Session

## STATE OF TENNESSEE, by and through Robert E. Cooper, Jr., Attorney General and Reporter for the State of Tennessee
### v.
## NV SUMATRA TOBACCO TRADING COMPANY

### Direct Appeal from the Chancery Court for Davidson County
No. 03-1613(II)     Carol L. McCoy, Chancellor

### No. M2010-01955-COA-R3-CV - Filed June 28, 2011

This appeal involves *in personam* jurisdiction over a foreign defendant. Appellant State of Tennessee brought suit against Appellee tobacco product manufacturer, under the Tobacco Escrow Fund Act, Tennessee Code Annotated Sections 47-31-101 *et seq*., alleging that Appellee had failed to make escrow deposits, as required under the Act, for cigarettes sold in Tennessee. Based upon the trial court's finding that it lacked personal jurisdiction over the Appellee, it entered summary judgment in favor of the manufacturer. The State appeals. Upon review, we conclude that: (1) the facts of this case show that the manufacturer intentionally used a distribution system with the desired result of selling its product in all fifty states, including Tennessee, so as to support a finding that the manufacturer had minimum contacts with the State necessary to invoke the exercise of personal jurisdiction; (2) the exercise of personal jurisdiction, under the facts of this case, is reasonable and fair; (3) the manufacturer is subject to regulation under the Act; and (4) the Act is not unconstitutional. Moreover, we conclude that: (1) Appellee is a tobacco products manufacturer, as defined by the Escrow Fund Act; (2) Appellee's cigarettes were sold in Tennessee; and (3) Appellee is, therefore, liable for escrow payments under the Escrow Fund Act. Consequently, we grant the State's motion for summary judgment. The order of the trial court is reversed, and the matter is remanded for entry of summary judgment in favor of Appellant State and for calculation of the escrow amount owed by Appellee and entry of judgment thereon.

### Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Reversed, Summary Judgment granted to the State and case Remanded for Calculation of Escrow Funds Owed

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; and Joseph F. Whalen, Solicitor General; Rebekah A. Baker, Assistant Attorney General, for appellant, State of Tennessee.

Steven C. Douse, Nashville, TN and Christopher L. Rissetto, Washington. D.C, for the appellee, NV Sumatra Tobacco Trading Company.

**OPINION**

On May 26, 1999, the Tennessee Legislature enacted the Tennessee Tobacco Manufacturers' Escrow Fund Act of 1999, Tennessee Code Annotated Sections 47-31-101 *et seq*. (the "Escrow Fund Act," or "Act"). The Act requires a "tobacco product manufacturer selling cigarettes[1] to consumers within the state of Tennessee, whether directly or through a distributor, retailer or similar intermediary or intermediaries, after May 26, 1999, to either [b]ecome a participating manufacturer, as defined in § II(jj) of the Master Settlement Agreement ("MSA"),[2] and generally perform its financial obligations under the master settlement agreement"; or to make annual deposits into a qualified escrow fund based on the number of its cigarettes sold in Tennessee.[3] Tenn. Code Ann. §47-31-103. The Act specifies the amount of money per unit that must be placed in escrow, and further specifies that the amount must be adjusted for inflation according to a formula set forth in the MSA. Tenn. Code Ann. §§ 47-31-102(2) and 103(a)(2)(A). The Act further requires tobacco product manufacturers who do not join the MSA to certify annually, to the Attorney General, that they have complied with the escrow requirements. Tenn. Code Ann. § 47-31-103(a)(3). A "tobacco product manufacturer" is defined, in relevant part, as an entity that "after May 26, 1999, directly and not exclusively through any affiliate[4]: (i) Manufactures cigarettes

---

[1] The term "cigarette" is defined at Tennessee Code Annotated Section 47-31-101(4).

[2] "Master settlement agreement" means the settlement agreement, and related documents, entered into in the fall of 1998 by the state and leading United States tobacco product manufacturers. Tenn. Code Ann. § 47-31-102(5).

[3] "Qualified escrow fund" means an escrow arrangement with a federally or state chartered financial institution having no affiliation with any tobacco product manufacturer and having assets of at least one billion dollars ($l,000,000,000) where such arrangement requires that such financial institution hold the escrowed funds' principal for the benefit of releasing parties and prohibits the tobacco product manufacturer placing the funds into escrow from using, accessing or directing the use of the funds' principal except as consistent with § 47-31-103(a)(2)(B). Tenn. Code Ann. § 47-31-102(6).

[4] "Affiliate" means a person who directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, another person. Solely for purposes of this definition, "owns," "is owned" and "ownership" mean ownership of an equity interest, or the equivalent thereof, of ten
(continued...)

anywhere that such manufacturer intends to be sold in the United States, including cigarettes intended to be sold in the United States through an importer . . . ." Tenn. Code Ann. § 47-31-102(9)(A). If a tobacco product manufacturer fails to make the required escrow deposit, the Attorney General may "bring a civil action on behalf of the state against [that] tobacco product manufacturer." Tenn. Code Ann. § 47-31-103(a)(3).

Appellee NV Sumatra Tobacco Trading Company ("Sumatra") is a corporation organized under the laws of the Republic of Indonesia, which has its principal place of business at Jalan Pattimura No. 3, Sumatra Ultra, Prematang Siantar 21132 Indonesia. Sumatra produces a number of tobacco products, including cigarettes. As is relevant to the instant appeal, during the years 2000 through 2002, Sumatra made the "United" brand of cigarettes. It is undisputed that Sumatra is not a party to the 1998 MSA.

Sumatra owned the United States trademark for the "United American Blend & Design" cigarettes during the years 1999 through 2001; the United brand cigarettes were packaged at Sumatra's facility in Indonesia. On July 9, 2001, Timin Bingei, Executive Director of Sumatra, certified that the company owned the "United" trademark, which was registered with the United States Patent and Trademark Office.[5] Mr. Bingei further certified that Sumatra had consented to allow UNICO Trading Pte. Ltd., a corporation organized under the laws of Singapore, to appoint Silmar Trading Limited, a British Virgin Islands corporation, to be its exclusive buyer to distribute United brand cigarettes for sale in the United States. The certification states that it is to remain valid until December 31, 2001. We note that Sumatra does not have a direct contractual relationship with Silmar Trading specifically authorizing the sale of Sumatra's products in Tennessee.

In connection with its trademark application, on July 9, 2001, Sumatra submitted a list of ingredients contained in the United brand, for the time period January 1, 2000 through the year 2001. United cigarettes were found to be in full compliance with the reporting requirements of the Comprehensive Smoking Education Act. The United brand cigarettes, which were sold in the United States, all bore the required Surgeon General's warning, and the warnings were placed on the packages before they were shipped to the United States.

---

[4](...continued)
percent (10%) or more, and "person" means an individual, partnership, committee, association, corporation or any other organization or group of persons. Tenn. Code Ann. § 47-31-102(2).

[5] Specifically, Sumatra filed trademark applications for the United brand cigarettes on January 11, 1995 (registration date January 21, 1997), September 23, 2003 (registration date November 2, 2004), and February 27, 2004 (the record contains no registration date). In each of these trademark applications, Sumatra, through counsel and through Director Bingei, stated a bona fide intent to use the mark in United States commerce.

Basil Battah is the owner of American Automotive Security Products, d/b/a FTS Distributors ("FTS"). FTS is a corporation organized under the laws of the State of Florida, with its principal place of business located in Miami. FTS imported tobacco products into the United States, including the United brand cigarettes, from 1999 through 2001. FTS first became involved with the United brand when, sometime between 1999 and 2001, Pacific Coast Duty Free, a company located in California, asked FTS to purchase United brand cigarettes from them. Although Sumatra now argues that FTS acted on its own initiative in importing United brand cigarettes into the United States and distributing them in Tennessee, Mr. Battah's uncontested testimony indicates that FTS and Sumatra did have some sort of agreement, whereby FTS would be Sumatra's sole United States distributor:

> Q. Mr. Battah, at any time did you enter into a written or oral contract with anyone from . . . Sumatra about distributing their cigarettes?
>
>       *                        *                        *
>
> A. We had an oral agreement that I was their exclusive distributor. We wanted to put it in writing but we never got that far because they just stopped selling us cigarettes completely.

Despite the lack of a written contract, it is undisputed that FTS was the importer of all United brand cigarettes sold in the State of Tennessee during the years 2000 through 2002. Mr. Battah testified that he would typically place orders for United brand cigarettes with UNICO, Silmar, or Sumatra via facsimile or telephone. Mr. Battah further testified that a meeting took place in Beijing, China, with representatives from both UNICO and Sumatra, including Timin Bingei, the Executive Director of Sumatra. The purpose of this meeting was to discuss whether the packaging for the United brand cigarettes should be changed, whether Sumatra would join the MSA, and sales forecasts concerning where the United brand was selling well and where it was not. Mr. Battah testified that, at that meeting, he gave a presentation concerning where the United brand cigarettes were being sold across the United States. Mr. Battah's presentation included a chart, which showed the number of cigarettes sold in each state (i.e., the "stick count"). Mr. Battah testified that this presentation was prepared at the request of Sumatra. Specifically, Mr. Battah testified:

> Q. Can you describe the meeting, what was discussed at the meeting?
>
> A. The meeting was to discuss joining the master settlement agreement or remaining an NPM [i.e., non-participating

member]; changing the packaging and deciding on the new colors and new packaging and "Made in Indonesia" or removing "U.S." from the front of it; sales forecasts, where we were strong, what states we were strong in. We presented all of the facts of every sale, where it went, which states we needed to target and continue our business.

Q. And was there any discussion about sales occurring in Tennessee?

A. I don't know if there were particular discussions but we listed all the states and gave them a graph, a pie graph of where we were selling the most and Tennessee was one of those states.

Q. Okay. And were there any documents that were reviewed at the meeting that you recall?

A. Yes, all the data we provided, where our sales were, how many sticks we sold in any particular state.

Mr. Battah went on to state that the United brand cigarettes could "be purchased in California, Washington, Texas, Arizona, Louisiana, Mississippi, Georgia, South and North Carolina, New Hampshire, Oklahoma, Tennessee and Kentucky." The chart, which was allegedly used during the Beijing meeting, is included in this appellate record. It indicates that 74,600 units of United brand cigarettes (i.e., 74,600 cartons) were sold in Tennessee from 2000 through 2002. Moreover, Mr. Battah testified that pricing, and specifically its relation to the escrow requirement, was also discussed at the Beijing meeting:

It was discussed with . . . Sumatra that they were charging us probably three times the amount per carton of cigarettes that they should be and that they were collecting the money for the escrow. They were responsible, they would open accounts and they would pay if required.

A facsimile, dated July 24, 2001, was sent to Mr. Battah from Sumatra's International Trade, Sales & Services Department, and was signed by "Rama T. / Diana." This facsimile references Mr. Battah's report and acknowledges that the United brand is sold in Tennessee, where it may be subject to the Escrow Fund Act:

Your [Mr. Battah's] report on the United cigarettes you faxed to

us sometime ago stated that the said cigarettes can be purchased in California, Washington, Texas, Arizona, Louisiana, Mississippi, Georgia, South and North Carolina, New Hampshire, Oklahoma, Tennessee and Kentucky. Most of [the] States mentioned are subject to the Escrow Fund Act.

The facsimile goes on to state that Sumatra received "notice from the Office of the Attorney General in the 46 States subject to escrow such as Tennessee, New Hampshire, California, Pennsylvania, etc. to request confirmation whether our cigarettes were sold to their States and whether we have opened an account related to the escrow fund." In this facsimile, Sumatra further acknowledges that the notice "further stated that if manufacturers believe that they are not subject to the requirements of the Escrow Fund Act, they should send a written explanation in lieu of a completed certificate." In addition, the facsimile indicates that the notice Sumatra received contained the following, relevant provision:

The Office of the Attorney General may immediately initiate a civil action against the manufacturer to compel compliance and seek a civil penalty. The Escrow Fund Act provides that a manufacturer who fails to deposit requisite funds by the statutory deadline is subject to penalties that could include an amount equal to five percent (5%) of the withheld amount for each day the violation continues or in the case of a "knowing violation," an amount equal to fifteen percent (15%) of the withheld amount each day the violation continues.

Sumatra then requested that, "[s]ince United cigarettes are imported and distributed in Miami, Florida, which is not subject to the requirements of the Escrow Fund, but indirectly distributed to the states which require an Escrow Fund, please request FTS to check with their lawyer . . . on how to respond to the said notice."

Mr. Battah also testified about a meeting in Miami, sometime in 2002, where Nabil Hawe, a Sumatra representative, and Timin Bingei were in attendance. Sumatra asserts that there is a dispute in the record as to whether this meeting actually occurred; however, the Beijing meeting, discussed above, is not disputed. At any rate, Mr. Battah testified that, at the alleged Miami meeting, he again provided a booklet of sales statistics of the United brand cigarettes, which included a breakdown of the United brand sales through June of 2001, including the number of cartons sold in Tennessee:

Q. And aside from the meeting in Beijing, were there any other opportunities for you to meet with Mr. Hawe?

A. Yes, he came to Miami several times. I met with him numerous occasions.

Q. And what sorts of discussions did you have with him the times that he came to Miami?

A. Basically marketing strategy and building the brand and making it a nationwide brand.

Q. Was there ever any discussions with Mr. Hawe about states that the products would be sold into?

A. Yes, all fifty states it would be sold into. Sell as many states–our goal was to sell a thousand master cases per state.

To this end, Mr. Battah stated that Sumatra provided him with promotional materials for the United brand. Concerning the number of cigarettes, Mr. Battah stated that each pack of United brand cigarettes contains twenty cigarettes, each carton contains 10 packs of cigarettes, and master cases of United cigarettes contain fifty cartons of cigarettes.

The record indicates that, as late as 2004, Mr. Battah was still attempting to negotiate a written distribution agreement with Sumatra. The draft agreement, which is in the record, contains a provision that the manufacturer (i.e., Sumatra) would be responsible for compliance with escrow payments for sales in the various states and that Sumatra would take the necessary steps to ensure compliance in each state.

There is no dispute in the record that Sumatra's United brand cigarettes were sold in Tennessee. It appears, from the correspondence that passed between Sumatra and Mr. Battah, *supra*, that Sumatra was aware that its cigarettes were being sold in Tennessee, and that Sumatra was further aware that it could face liability for failure to pay into the escrow fund. We note that bills of lading and invoices show that shipments of United brand cigarettes, originating at Sumatra's facility in Indonesia, were sent directly to Miami, Florida for distribution. According to licensed distributor reports, which were filed with the State of Tennessee between January 1 and December 31, 2000, 1,340,000 United brand cigarettes were stamped for sale in Tennessee. Between January 1 and December 31, 2001, 9,595,200 Sumatra cigarettes were stamped for sale in Tennessee. Between January 1 and December 31, 2002, 657,600 United brand cigarettes were stamped for sale in Tennessee. It is undisputed that Sumatra did not deposit: (1) $14,941.82 into a qualified escrow account by April 15, 2001; (2) $143,262.09 into a qualified escrow account by April 15, 2002; or (3) $10,112.92 into a qualified escrow account by April 15, 2002. Moreover, there is no dispute

-7-

that Sumatra failed to certify its compliance with the Escrow Fund Act for the calendar years 2000 through 2002, despite the fact that the State of Tennessee sent correspondence to Sumatra on March 21, 2001, May 7, 2001, and April 2, 2002, informing Sumatra of its escrow fund obligation.

On June 5, 2003, Appellant State of Tennessee (the "State") filed a complaint against Sumatra, alleging that Sumatra had violated the Escrow Fund Act for cigarettes manufactured by Sumatra and sold in Tennessee during the years 2000 and 2001. On October 26, 2004, Sumatra filed a motion to dismiss, alleging that the trial court lacked personal jurisdiction over the company. On September 2, 2005, the State filed a response, opposing the motion to dismiss. By order of September 6, 2006, the trial court denied Sumatra's motion. Sumatra then filed a motion for permission to take an interlocutory appeal of the issue, and the trial court granted that motion on October 30, 2006. However, this Court denied the request for an interlocutory appeal on November 29, 2006.

On December 6, 2006, the State filed its first amended complaint, adding allegations for United brand cigarettes sold in the State of Tennessee during the year 2002. On March 30, 2007, Sumatra filed its answer, denying liability but admitting that no escrow deposits were made for those sales. The State then filed a motion to strike Sumatra's affirmative defenses, which motion was granted in part and denied in part. Specifically, the trial court struck Sumatra's defenses related to federal constitutional and statutory provisions, but denied the State's motion to strike Sumatra's affirmative defenses that rely on Tennessee state constitutional provisions.

On November 28, 2007, the State filed a motion for a protective order and discovery conference, and Sumatra opposed that motion. On February 25, 2008, the parties filed an agreed order concerning discovery, and the court denied the State's motion without prejudice. On April 16, 2008, the case was transferred to Chancery Court Part II. The parties filed a joint stipulation of facts on December 22, 2008.

Both sides filed motions for summary judgment on March 16, 2009. On November 25, 2009, Sumatra moved to strike certain documents. On February 1, 2010, the court ordered that supplemental discovery be undertaken prior to the hearing on the motions for summary judgment, and specifically ordered that an additional deposition of Basil Battah be taken. The time period for this supplemental discovery was extended at least once, and both parties filed supplemental briefs on the cross-motions for summary judgment on May 13, 2010. The motions for summary judgment were heard on June 9, 2010. By order of August 18, 2010, the trial court granted summary judgment in favor of Sumatra and dismissed the case. The trial court analyzed the case as both a general personal jurisdiction case, and also as a specific personal jurisdiction case. Since personal jurisdiction cannot be both general and

specific simultaneously, we must determine which, if either, is applicable. However, the fact that the trial court analyzed it under both categories is not fatal to its order. The relevant findings of the trial court were as follows:

> The uncontested facts reflect that no Sumatra employee ever traveled to Tennessee for the purpose of conducting business, that no Sumatra employee ever initiated contact with any individual or entity in Tennessee, and that Sumatra does not sell any cigarettes in Tennessee directly or through its agent. Further evidence from the uncontested facts is that Sumatra owns a U.S. trademark for the United-brand placed on its cigarette packages and that the ingredient report for the United-brand cigarettes had been filed with the Federal Trade Commission ("FTC") in Washington, D.C. In addition, the parties stipulated that the United-brand cigarettes are labeled with the U.S. Surgeon General's warning about the dangers of smoking as required by U.S. law and that the United-brand packaging identifies the product as an American blend.

> For purposes of summary judgment only, the State does not dispute that Sumatra does not own or have any interest in UNICO or Silmar Trading nor does Sumatra have any contractual relationship with Silmar Trading permitting or authorizing the sale of United-brand cigarettes in Tennessee. Likewise, the State does not dispute that Sumatra has no contractual relationship with FTS, nor does it have any contractual relationship permitting or authorizing the sale of Sumatra produced cigarettes in Tennessee with FTS. The State does not dispute that Sumatra has no ownership interest in FTS and FTS has no ownership interest in Sumatra. Also undisputed is the acknowledgment by FTS' President, Mr. Battah, that FTS had complete ownership of the United-brand cigarettes purchased from Silmar Trading and that FTS shipped millions of cigarettes to a free-trade zone in Miami, Florida.

>        *                      *               *

> [T]he record reflects that Sumatra did not sell its cigarettes in Tennessee, either directly or through an agent, it did not operate through a distributor to sell cigarettes in Tennessee, it did not

advertise in Tennessee, it had no agents in Tennessee, and it produced no promotional materials to be used in Tennessee. Sumatra paid no federal excise taxes nor did it seek any waivers from U.S. Customs laws and regulations. Further, it appears from the record that FTS, the company that imported the cigarettes into Miami, had no relationship, documented or otherwise, with Sumatra. FTS, through its president, Mr. Battah, arranged to affix the FTC warnings on the United-brand packages and filed the FTC rotation plan and Health and Human Services' ingredient list.

\* \* \*

The State relies upon a series of transactions from Indonesia to Singapore to the British Virgin Islands to Florida and then to Tennessee, which resulted in United-brand cigarettes being sold here, to support its action against Sumatra. The State contends that Sumatra's act of placing the United-brand cigarettes into the stream of commerce in this fashion allows this Court to exercise personal jurisdiction over Sumatra....

The State appeals and raises two issues for review as stated in its brief:

1. Whether the Chancery Court erred in holding that the Court lacked personal jurisdiction over Defendant NV Sumatra Tobacco Trading Company.

2. Whether summary judgment should be awarded to the State.

A trial court's decision to grant a motion for summary judgment presents a question of law. Our review is, therefore, *de novo* with no presumption of correctness afforded to the trial court's determination. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). "This Court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied." *Mathews Partners, LLC v. Lemme*, No. M2008–01036–COA–R3–CV, 2009 WL 3172134, at \*3 (Tenn. Ct. App. Oct. 2, 2009) (citing *Hunter v. Brown*, 955 S.W.2d 49, 50–51 (Tenn. 1977)).

When a motion for summary judgment is made, the moving party has the burden of showing that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The moving party may

accomplish this by either: (1) affirmatively negating an essential element of the non-moving party's claim; or (2) showing that the non-moving party will not be able to prove an essential element at trial. ***Hannan v. Alltel Publ'g Co.***, 270 S.W.3d 1, 8–9 (Tenn. 2008). However, "[i]t is not enough for the moving party to challenge the nonmoving party to 'put up or shutup' or even to cast doubt on a party's ability to prove an element at trial." ***Id***. at 8. If the moving party's motion is properly supported, "[t]he burden of production then shifts to the nonmoving party to show that a genuine issue of material fact exists." ***Id***. at 5 (citing ***Byrd v. Hall***, 847 S.W.2d 208, 215 (Tenn. 1993)). The nonmoving party may accomplish this by: "(1) pointing to evidence establishing material factual disputes that were overlooked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for the trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P. Rule 56.06." ***Martin v. Norfolk S. Ry. Co.***, 271 S.W.3d 76, 84 (Tenn. 2008) (citations omitted).

When reviewing the evidence, we must determine whether a factual dispute exists. "Summary judgment procedure is not a substitute for trial. It is only when there is no disputed issue of material fact that a summary judgment should be granted. If such fact issue is present, the matter must not be resolved by a battle of affidavits, but must be resolved by a trial on the merits." ***Stone v. Hinds***, 541 S.W.2d 598, 599 (Tenn. Ct. App. 1976) (citations omitted). In evaluating the trial court's decision, we review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. ***Stovall v. Clarke***, 113 S.W.3d 715, 721 (Tenn. 2003). If we find a disputed fact, we must "determine whether the fact is material to the claim or defense upon which summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." ***Mathews Partners***, LLC, 2009 WL 3172134, at *3 (citing ***Byrd***, 847 S.W.2d at 214). "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." ***Byrd***, 847 S.W.2d at 215. A genuine issue exists if "a reasonable jury could legitimately resolve the fact in favor of one side or the other." ***Id***. "Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion." ***Landry v. S. Cumberland Amoco, et al.***, No. E2009–01354–COA–R3–CV, 2010 WL 845390, at *3 (Tenn. Ct. App. March 10, 2010) (citing ***Carvell v. Bottoms***, 900 S.W.2d 23 (Tenn. 1995)).

We have reviewed the appellate record, and we conclude that, although there is some dispute of fact, the material facts are undisputed. Therefore, we are left only with a question of law as to whether Sumatra should be subject to personal jurisdiction in a Tennessee court. Accordingly, this Court will review the trial court's decision *de novo*, with no presumption of correctness, for the purpose of determining whether the plaintiff has made out a *prima facie* case for the exercise of personal jurisdiction over the defendant. ***Woodruff v. Anastasia***

*Int'l, Inc.*, No. E2007-00874-COA-R3CV, 2007 WL 4439677, at *3 (Tenn. Ct. App. Dec. 19, 2007), perm. app. withdrawn (Apr. 7, 2008); *In re Clark*, No. W2005-01687-COA-R3-JV, 2007 WL 152537, at *10 (Tenn. Ct. App. Jan. 22, 2007) (No Tenn. R. App. P. 11 application filed). In the instant case, the State bears the ultimate burden of demonstrating that the trial court may properly exercise personal jurisdiction over Sumatra. *Chenault v. Walker*, 36 S.W.3d 45, 56 (Tenn. 2001); *Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd.*, 832 S.W.2d 572, 577 (Tenn. Ct. App. 1992). However, this burden is ordinarily not a heavy one, because personal jurisdiction need only be demonstrated by a preponderance of the evidence. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 644 (Tenn. 2009).

## PERSONAL JURISDICTION

### A. Development of the Law on Personal Jurisdiction

The United States Supreme Court has held that due process requires that personal jurisdiction over a nonresident defendant can only be exercised if that defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)). This is a two-part test, which requires evaluating whether the requisite minimum contacts are present and whether the exercise of jurisdiction is fair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Davis Kidd Booksellers*, 832 S.W.2d at 575.

The outer limits of the ability of Tennessee's courts to exercise jurisdiction over nonresident defendants are defined by statute. These "long-arm statutes" are found at Tennessee Code Annotated Section 20-2-223(a),[6] Tennessee Code Annotated Section

---

[6] **Tenn. Code Ann. § 20-2-223. Personal jurisdiction based on conduct.**

(a) A court may exercise personal jurisdiction over a person, who acts directly or indirectly, as to a claim for relief arising from the person's:

    (1) Transacting any business in this state;
    (2) Contracting to supply services or things in this state;
    (3) Causing tortious injury by an act or omission in this state
    (4) Causing tortious injury in this state by an act or omission outside this state of the person who regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;
    (5) Having an interest in, using or possessing real property in this state;

(continued...)

20-2-214(a)(6),[7] and Tennessee Code Annotated Section 20-2-225.[8]

---

[6](...continued)

(6) Contracting to insure any person, property or risk located within this state at the time of contracting; or

(7) Conduct as a director or officer of a domestic corporation or the conduct of a domestic corporation while the person held office as a director or officer.

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against that person.

[7] **Tenn. Code Ann. § 20-2-214. Personal service; unavailability; jurisdiction.**

(a) Persons who are nonresidents of this state and residents of this state who are outside the state and cannot be personally served with process within this state are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from:

(1) The transaction of any business within this state;

(2) Any tortious act or omission within this state;

(3) The ownership or possession of any interest in property located within this state;

(4) Entering into any contract of insurance, indemnity or guaranty covering any person, property or risk located within this state at the time of contracting;

(5) Entering into a contract for services to be rendered or for materials to be furnished in this state;

(6) Any basis not inconsistent with the constitution of this state or of the United States;

(7) Any action of divorce, annulment or separate maintenance where the parties lived in the marital relationship within this state, notwithstanding one party's subsequent departure from this state, as to all obligations arising for alimony, custody, child support or marital dissolution agreement, if the other party to the marital relationship continues to reside in this state.

(b) As used in this section, "person" includes corporations and all other entities that would be subject to service of process if present in this state.

(c) Any such person shall be deemed to have submitted to the jurisdiction of this state who acts in the manner described in subsection (a) through an agent or personal representative.

[8] **Tenn. Code Ann. § 20-2-225. Other bases of jurisdiction unaffected; jurisdiction whenever permitted by constitution**.

A court of this state may exercise jurisdiction:

(continued...)

As noted by our Supreme Court in *Gordon v. Greenview Hospital*:

In 1972, the Tennessee General Assembly amended Tennessee's long-arm statute to provide that "[p]ersons who are nonresidents of this state . . . are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from . . . [a]ny basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a)[(6)] (2009).

The intent of the 1972 amendment was to lengthen the reach of the long-arm statute to the farthest extent permitted by due process. Accordingly, Tennessee's courts later observed that the addition of Tenn. Code Ann. § 20-2-214(a)(6) [, which allows personal jurisdiction on "[a]ny basis not inconsistent with the constitution of this state or of the United States,"] converted the long-arm statute from a "single enumerated act" statute to a "minimum contacts" statute that permitted Tennessee courts to exercise personal jurisdiction over nonresident defendants to the full limit permitted by due process. *Masada Inv. Corp. v. Allen*, 697 S.W.2d at 334; *Shelby Mut. Ins. Co. v. Moore*, 645 S.W.2d 242, 245-46 (Tenn. Ct. App.1981).

*Gordon v. Greenview Hosp*., 300 S.W.3d at 645 (footnote omitted).

Federal and state courts now recognize two types of personal jurisdiction – specific jurisdiction and general jurisdiction. The United States Supreme Court first distinguished between specific and general jurisdiction in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). Tennessee adopted the distinction between specific and general jurisdiction in the 1992 case, *J.I. Case Corp. v. Williams*, 832 S.W.2d 530, 532 (Tenn. 1992), *rev'd on other grounds*, 300 S.W.3d 635 (Tenn. 2009). In *Gordon v. Greenview Hospital*, our Supreme Court explained the distinction between specific and general jurisdiction:

---

[8](...continued)
(1) On any other basis authorized by law; or
(2) On any basis not inconsistent with the constitution of this state or of the United States.

-14-

Specific jurisdiction may be asserted when the plaintiff's cause of action arises from, or is related to, the nonresident defendant's activities in or contacts with the forum state. To invoke specific jurisdiction, a plaintiff must show (1) that the nonresident defendant has purposely established significant contact with the forum state and (2) that the plaintiff's cause of action arises out of or is related to these activities or contacts. ***Burger King Corp. v. Rudzewicz***, 471 U.S. at 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528. The nonresident defendant's contacts with the forum state must be sufficient to enable a court to conclude that the defendant "should reasonably anticipate being haled into court [in the forum state]." ***Lindsey v. Trinity Commc'ns, Inc.***, 275 S.W.3d 411, 418 (Tenn. 2009) (quoting ***World-Wide Volkswagen***, 444 U.S. at 297, 100 S. Ct. 559, 62 L. Ed. 2d 490). If the plaintiff can make that showing, the defendant will have the burden of showing that the exercise of specific jurisdiction would be unfair. ***Burger King Corp. v. Rudzewicz***, 471 U.S. at 477, 105 S. Ct. 2174; , 85 L. Ed. 2d 528 16 Moore's Federal Practice § § 108.42[1], at 108-54, 108.42[6], at 108-77.

In contrast to specific jurisdiction, general jurisdiction may be asserted when the plaintiff's cause of action does not arise out of and is not related to the nonresident defendant's activities in the forum state. The threshold for satisfying the requirements for general jurisdiction is substantially higher than the requirements for establishing specific jurisdiction. 4 Charles Alan Wright & Arthur R. Miller *Federal Practice and Procedure* § 1067.5, at 517. An assertion of general jurisdiction must be predicated on substantial forum-related activity on the part of the defendant. The nonresident defendant's contacts with the forum state must be sufficiently continuous and systematic to justify asserting jurisdiction over the defendant based on activities that did not occur in the forum state. ***Helicopteros Nacionales de Colombia, S.A. v. Hall***, 466 U.S. at 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404; ***Perkins v. Benguet Consol. Mining Co.***, 342 U.S. at 448, 72 S. Ct. 413, 96 L. Ed. 485, ***Lindsey v. Trinity Commc'ns, Inc.***, 275 S.W.3d at 417; *see also* 4 Federal Practice and Procedure § 1067.5, at 507.

The general jurisdiction inquiry is very different from the

specific jurisdiction inquiry. The United States Court of Appeals for the Fifth Circuit has pointed out that "[u]nlike the specific jurisdiction analysis, which focuses on the cause of action, the defendant and the forum, a general jurisdiction inquiry is dispute blind, the sole focus being on whether there are continuous and systematic contact between the defendant and the forum." *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 339 (5th Cir. 1999). In order to warrant the exercise of general jurisdiction over a nonresident defendant, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." 4 Federal Practice and Procedure § 1067.5, at 507.

The proper analysis for determining whether a defendant's contacts are "continuous and systematic" enough to warrant an assertion of general jurisdiction requires ascertaining whether "the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Lindsey v. Trinity Commc'ns, Inc.*, 275. S.W.3d at 417 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. at 318, 66 S. Ct. 154, 90 L. Ed. 95).

Questions involving whether a nonresident's contacts with the forum state are sufficient to warrant the exercise of general jurisdiction are extremely fact dependent. 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1069.4, at 164, 185 (3d ed. 2002).... Determining whether it is appropriate to exercise jurisdiction entails a careful, non-mechanical evaluation of the facts with particular focus on the nonresident defendant's contacts with the forum state. *Int'l Shoe Co. v. Washington*, 326 U.S. at 319, 66 S. Ct. 154, 90 L. Ed. 95.

Lest the distinction between the basis for specific jurisdiction and general jurisdiction be overlooked, we emphasize that the assertion of specific jurisdiction is appropriate only when the plaintiff's cause of action arises from

or is related to the defendant's contacts with the forum state. However, general jurisdiction is appropriate when the plaintiff's cause of action does not arise from and is not related to the defendant's contacts with the forum state. Thus, when a plaintiff's cause of action is based on the defendant's activities in or contacts with the forum state, specific jurisdiction, as opposed to general jurisdiction, applies. Therefore, consistent with the due process requirements of the federal and state constitutions, when a nonresident defendant's contacts with a forum state are substantial, systematic, and continuous, and the exercise of general jurisdiction satisfies the fairness requirement, the cause of action need not arise out of or relate to those contacts.

*Gordon v. Greenview Hosp.*, 300 S.W.3d at 647-49 (footnotes omitted).

Because Sumatra has no "sufficiently continuous and systematic" contacts with Tennessee, any finding of personal jurisdiction in this case must be predicated upon specific, as opposed to general, jurisdiction. Specifically, the gravamen is whether Sumatra's contacts with Tennessee are sufficient to enable our court to conclude that Sumatra "should reasonably anticipate being haled into court [in the forum state-here, Tennessee]." *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 418 (Tenn. 2009).

In *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332 (Tenn.1985), our Supreme Court discussed the requisite factors, which determine the existence or absence of minimum contacts, stating:

[T]hree primary factors are to be considered in determining whether the requisite minimum contacts were present: the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts. Two lesser factors to be considered are the interest of the forum State and convenience.

*Masada*, 697 S.W.2d at 334 (relying upon *Shelby Mut. Ins. Co. v. Moore*, 645 S.W.2d 242, 246 (Tenn. Ct. App. 1981)). Under Tennessee's "minimum contacts" test, the cause of action need not arise in this State. *Masada*, 697 S.W.2d at 332; *see also Walker v. Nationwide Ins. Co.*, 813 S.W.2d 135, 138 (Tenn. Ct. App. 1990). Moreover, all five factors set out in *Masada* need not be present in order for courts of this State to exercise personal jurisdiction. *Walker*, 813 S.W.2d at 138. Furthermore, the defendant's contacts with the forum state need

not be physical, and the court will primarily examine the quantity of the contacts, their nature and quality, and the relationship between the contacts and the cause of action. ***Masada***, 697 S.W.2d at 334. As part of its evaluation of the reasonableness of exercising jurisdiction, the court "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several States in furthering fundamental substantive social policies.'" ***Asahi Metal Indus. Co. v. Superior Court***, 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (quoting ***World-Wide Volkswagen Corp. v. Woodson***, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

The first step in a minimum-contacts analysis, therefore, is to determine whether the defendant has sufficient contacts with the forum state. The second step is to evaluate those contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" ***Burger King***, 471 U.S. at 475 (quoting ***International Shoe***, 326 U.S. at 320). Thus, the decision whether it is fair and reasonable to compel the non-resident to defend a suit may depend upon a balancing of various factors in addition to the defendant's contacts with the forum. *See* 2 *Moore's Federal Practice* ¶ 4.41-1[3], at 4-450 (2d ed. 1985).

Other considerations can affect the balance, such as the extent to which the defendant has purposely availed itself of the privilege of conducting business in the forum state. ***Ins. Co. of N. Am. v. Marina Salina Cruz***, 649 F.2d 1266, 1270 (9th Cir. 1981). The greater the benefits derived from the defendant's contacts with the forum state, the more reasonable it is to require the defendant to be subject to the jurisdiction of the forum. Another consideration is the plaintiff's contacts with the forum. Although the lack of such contacts cannot defeat jurisdiction over the defendant, their existence may be so manifold as to tip the balance in favor of the exercise of jurisdiction over the defendant when that exercise otherwise would have been improper. ***Calder v. Jones***, 465 U.S. 783, 788, 104 S. Ct. 1482, 1486, 79 L. Ed. 2d 804, 811 (1984).

Through the balancing process, a plaintiff may:

> establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.

*Burger King*, 471 U.S. at 477 (citations omitted). In balancing these various considerations, the court ultimately must determine whether it is fair and reasonable to subject a non-resident defendant to the jurisdiction of the forum.

Throughout this century, "a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957). As the Court stated in *McGee*:

> In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.

*McGee*, 355 U.S. at 222-23.

With the metamorphosis from a national to an international economy, the expansion of state jurisdiction has special relevance for foreign corporations engaged in commercial activities throughout the United States. *See Helicopteros*, 466 U.S. at 421 (Brennan, J., dissenting). As noted by Justice Brennan, "it has become both necessary and . . . desirable to allow the States more leeway in bringing the activities of these nonresident corporations within the scope of their respective jurisdictions." *Id*. at 416 (Brennan, J., dissenting).

In the landmark case of *World-Wide Volkswagen*, the Supreme Court extended the trend of expanding personal jurisdiction over non-resident corporations by recognizing the stream-of-commerce theory as a basis for establishing personal jurisdiction over a foreign manufacturer or distributor. Under this theory, a forum state may exercise jurisdiction over a non-resident corporation "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen*, 444 U.S. at 298.

In *Burger King*, the Supreme Court affirmed its commitment to the stream-of-commerce theory as an independent basis to satisfy the minimum-contacts standard. *Burger King*, 471 U.S. at 473. The Court observed that a foreign corporation that delivers its products into the stream of commerce has fair warning that it will be subject to suits in those states where consumers purchase its products. *Id*. The Court concluded that

-19-

because such corporations:

> 'purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.

*Id*. at 473-74 (citations omitted).

In ***World-Wide Volkswagen***, *supra*, 444 U.S. at 297-98, the Supreme Court noted that the stream-of-commerce theory would apply to subject foreign manufacturers and major distributors, but not local retailers or distributors, to jurisdiction in the states where their products were eventually shipped and sold. The foreseeable market served by local retailers and distributors, which are at the end of the distribution chain, is constrained. *See, e.g.,* ***Nelson by Carson v. Park Indus., Inc***., 717 F.2d 1120, 1125 (7th Cir. 1983); ***Bunnan Tong & Co., Ltd. v. F.W. Woolworth Co.***, 465 U.S. 1024, 104 S. Ct. 1277, 79 L. Ed. 2d 682 (1984); ***Rockwell Int'l Corp. v. Costruzioni Aeronautiche Giovanni Agusta***, 553 F. Supp. 328, 332 (E.D. Pa. 1982). In contrast, manufacturers and distributors, which are at the start of a distribution chain, serve a larger market and "purposely conduct their activities to make their product available for purchase in as many forums as possible." ***Nelson by Carson***, 717 F.2d at 1125. For such a manufacturer, the sale of its product in a distant state is not simply an isolated event, but the result of the corporation's efforts to cultivate the largest possible market for its product. ***Rockwell Int'l Corp***., 553 F. Supp. at 332. Because the manufacturer and primary distributor intend to serve and derive benefits from a larger market, it is fair to subject them to jurisdiction, while excusing a secondary distributor or retailer. ***Nelson by Carson***, 717 F.2d at 1125-26.

As observed in several cases, foreign manufacturers derive benefits from the indirect sale of their products throughout the United States. *See, e.g.,* ***Nelson by Carson*** at 1126; ***DeJames v. Magnificence Carriers, Inc***., 654 F.2d 280, 285 (3rd Cir. 1981), *cert. denied*, 454 U.S. 1085, 102 S. Ct. 642, 70 L. Ed. 2d 620 (1981); ***Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty, Ltd.***, 647 F.2d 200, 205 (D.D.C. 1981). By increasing the distribution of its products, the manufacturer not only benefits economically from indirect sales to forum residents, but also benefits from the protection provided by the laws of the forum state. Thus, a manufacturer that distributes its products into the stream of commerce for widespread distribution derives both legal and economic benefits from the states in which its products are sold. In sum, the system through which the manufacturer distributes its products evidences the manufacturer's purposeful penetration of the market.

A foreign manufacturer that purposefully avails itself of those benefits should be subject to personal jurisdiction, even though its products are distributed by independent companies. *See, e.g.*, *DeJames*, 654 F.2d at 285; *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n. 8 (5th Cir. 1980). In today's complex business world, foreign manufacturers rarely deliver products directly to consumers in the United States. Instead, these manufacturers employ middlemen, many of whom are often independent, to act as their distribution arms. To allow a foreign manufacturer to shield itself from liability caused by its products distributed by those middlemen would be to permit "a legal technicality to subvert justice and economic reality in the worst sense." *Certisimo v. Heidelberg Co.*, 298 A.2d 298, 304 (N.J. Super. 1972). Foreign manufacturers should not be allowed to insulate themselves by using intermediaries in a chain of distribution or by professing ignorance of the ultimate destination of their products. *See, e.g.*, *DeJames*, 654 F.2d at 285; *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1144 (7th Cir. 1975); *Rockwell Int'l Corp.*, 553 F. Supp. at 334; *Hetrick v. American Honda Motor Co., Inc.*, 429 F. Supp. 116, 118-19 (D. Neb. 1976). Thus, the stream-of-commerce theory supports personal jurisdiction over foreign manufacturers that derive benefits from the distribution and sale of their products in the United States.

Based upon the foregoing, the fact that Sumatra had no direct contact with Tennessee is not dispositive to the question of personal jurisdiction in light of the fact that its United brand cigarettes were placed into the stream of commerce. However, it is well settled that merely placing something into the stream of commerce is not sufficient to establish personal jurisdiction. *Asahi*, 480 U.S. 102, 112, 107 S. Ct. 1026, 94 L. Ed. 2d 92. For example, in *Mullins v. Harley-Davidson Yamaha BMW of Memphis, Inc.*, 924 S.W.2d 907 (Tenn. Ct. App. 1996), the plaintiff's decedent was injured in a motorcycle accident. His death was attributed to a defective helmet. The Korean manufacturer of the helmet was named as a defendant. We held that Tennessee's exercise of personal jurisdiction over that defendant would not comport with due process because the manufacturer established that it maintained no office or place of business in the United States, and sold helmets to distributors, who were "free to sell to any dealer of their choosing in the United States." *Id*. at 909. Furthermore, the manufacturer did not sell directly to dealers, did not sell motorcycle helmets or any other products directly into Tennessee, and did not create or control the distribution system that brought the helmets into the state. *Id*. Additionally, the manufacturer neither advertised in Tennessee, nor solicited business in Tennessee. *Id*.

In reaching its decision, the *Mullins* court principally relied upon two decisions, *Asahi Metal Industries Company v. Superior Court*, 480 U.S. 102, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987), and *Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd.*, 832 S.W.2d 572 (Tenn. Ct. App. 1992). As discussed above, in *Asahi*, four members of the United States Supreme Court were of the opinion that placing a product into the stream of commerce,

without more, was not an act purposely directed to a particular state. ***Asahi Metal Indus. Co. v. Superior Court***, 480 U.S. at 112. Four other members of the Court disagreed, stating that placing a product into the stream of commerce, with the awareness that it would be marketed in the forum state, was an act purposely directed toward the forum state. ***Asahi Metal Indus. Co. v. Superior Court***, 480 U.S. at 116–17, 107 S. Ct. at 1034–35 (Brennan, J., concurring in part and concurring in the judgment). As noted by this Court in ***Davis Kidd***:

> Even though the United States Supreme Court [in ***Asahi***] could not agree on the proper application of the stream of commerce rationale, a majority of the Court agreed upon a decision based on a more traditional minimum contacts analysis. ***Asahi Metal Indus. Co. v. Superior Court***, 480 U.S. at 113–16, 107 S. Ct. at 1033–34. In the process, four justices agreed that a non-resident defendant could be considered to have purposely directed its business activities toward a state if it "market[ed] the product through a distributor who has agreed to serve as a sales agent in the forum state." ***Asahi Metal Indus. Co. v. Superior Court***, 480 U.S. at 112, 107 S. Ct. at 1032. Seizing on this language, Davis Kidd, Private Edition, and Graces, Inc. insist that Day–Impex's national supply and license agreement with Sprinkler Bulb is the sort of distributor agreement that supplies the requisite affiliating circumstances with Tennessee. We disagree.

***Davis Kidd***, 832 S.W.2d at 575.

The ***Davis Kidd*** holding confirms that simply placing a manufactured item into the "stream of commerce" does not suffice to establish personal jurisdiction in Tennessee. As the Supreme Court stated: "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." ***Asahi***, 480 U.S. at 112. The ***Mullins*** court, and the ***Davis Kidd*** court before it, concluded that ***Asahi*** did not represent an exception to the traditional "minimum contacts" analysis, and held that the exercise of personal jurisdiction in those cases would violate due process.

Although placing a product into the stream of commerce is not, in itself, sufficient to satisfy the minimum contacts analysis, this is not to say that a court may not consider stream of commerce in reaching its decision on jurisdiction. This "stream of commerce" analysis is succinctly explained in 18 Fletcher's Cyclopedia on the Law of Private Corporations § 8640.40:

> The foreseeability that is critical to the due process

analysis is that the defendant's conduct in connection with the forum state are such that it should reasonably anticipate being haled into court there. [*Burger King*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528; *World-Wide Volkswagen*, 444 U.S. 286]. Jurisdiction cannot be imposed on a foreign corporate defendant that has no contacts with the forum state merely by reason of the fortuitous appearance of one of the defendant's products [in the forum state]. [*World-Wide Volkswagen*, 444 U.S. 286].

The "substantial connection" between the defendant and the forum state necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum state. [*Asahi*, 480 U.S. 102]. However, the placement of a product into the stream of commerce without more is not an act of a defendant that is purposefully directed toward the forum state. [*Id*.] In other words, the appropriate test is not knowledge or awareness of the ultimate destination of the product, but whether the manufacturer has purposely engaged in forum activities so it can reasonably expect to be haled into court there; and even if this is so, the minimum requirements of fair play and substantial justice may yet defeat jurisdiction. [*Falkirk Min. Co. v. Japan Steel Works, Ltd.*, 906 F.2d 369 (C.A.8 1990) (merely bringing parts sold to American corporation by Japanese manufacturer and its American subsidiary into forum state insufficient); *Halderman v. Sanderson Forklifts Co., Ltd.*, 818 S.W.2d 270 (Ky. Ct. App. 1991) (refusing to apply stream of commerce doctrine); *Dillaplain v. Lite Industries, Inc.*, 788 S.W.2d 530 (Mo. Ct. App. 1990) (holding placing of product into stream of commerce plus knowledge of ultimate destination sufficient); *Cox v. Hozelock, Ltd.*, 105 N.C. App. 52, 411 S.E.2d 640 (N. Carolina Ct. App. 1992)]. Thus, personal jurisdiction may be asserted over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by the consumer in the forum state, but not where the product's presence in that state is a single, isolated occurrence. [*Falkirk*, 906 F.2d 369]. In comparison, a corporation may be subject to the jurisdiction of the courts of a particular state when it has purposefully injected its product into the stream of

commerce without any indication that it desired to limit the area of distribution of its product so as to exclude that state. An example is where a foreign corporation has given an exclusive sales license to a licensee in the United States with no limits as to the forum state. The due process analysis is concerned with more than territory, otherwise, the presence of the defendant's product in the forum would be enough to justify the exercise of jurisdiction. However, the nature of the product may well have a bearing upon the nature and extent of the necessary minimum contacts.

*Id*. (some citations omitted).

Turning back to ***Davis Kidd***, in that case, Davis Kidd retail stores suffered extensive damage when an automatic sprinkler system malfunctioned. Davis Kidd, Private Edition, and Graces, Inc. brought suit against the Pennsylvania distributor of sprinkler head components and the British manufacturer of those components. The manufacturer and distributor moved to dismiss for lack of personal jurisdiction. This Court granted an interlocutory appeal to determine whether personal jurisdiction over the manufacturer and distributor was proper. In writing for the Court, Judge, now Justice, Koch held that exercise of personal jurisdiction over the distributor or manufacturer would be neither fair, nor just. In reaching this decision, Judge Koch explained:

> Day–Impex's distribution agreement with Sprinkler Bulb is not the type of agreement contemplated by the ***Asahi*** court as providing a basis for exercising personal jurisdiction. While it gives Sprinkler Bulb the right to market glass bulbs throughout the United States, it does not mention Tennessee specifically. In the absence of any other conduct by Day–Impex or Sprinkler Bulb directed toward Tennessee, the nationwide distribution agreement is not evidence of a specific intent or purpose to serve the Tennessee market. Thus, if a Tennessee court is to exercise personal jurisdiction over Day–Impex or Sprinkler Bulb, it must point to affiliating circumstances in addition to the distribution agreement.
>
> *                    *                    *
>
> Tennessee has some connection with the transaction that precipitated this lawsuit. The plaintiffs are Tennessee residents,

and the property damage occurred in Tennessee. Thus, Davis Kidd, Private Edition, and Graces, Inc. have some interest in a convenient Tennessee forum for pursuing their claims, and Tennessee has a corresponding interest in providing a convenient forum for its residents. *See Shute v. Carnival Cruise Lines*, 897 F.2d 377, 387 (9th Cir. 1990); *New Bern Pool & Supply Co.*, 94 N.C. App. 619, 381 S.E.2d 156, 160 (1989). However, these interests must be balanced against the other interests discussed in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. at 113, 107 S. Ct. at 1033 and *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 292, 100 S. Ct. at 564.[9]

\*        \*        \*

Under these facts, exercising personal jurisdiction over Day–Impex or Sprinkler Bulb would be neither fair nor just. When Sprinkler Bulb sold Day–Impex's glass bulbs to Firematic in Massachusetts, neither Day–Impex nor Sprinkler Bulb could reasonably have anticipated that they would be haled into Tennessee's courts. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297, 100 S. Ct. at 567; *Masada Inv. Co. v. Allen*, 697 S.W.2d at 334.

*Davis Kidd*, 832 S.W.2d at 576-77.

Although the *Davis Kidd* court ultimately held that jurisdiction over the sprinkler

---

[9] The *Asahi* Court specifically stated:

> We have previously explained that the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi*, 480 U.S. at 113 (quoting *World-Wide Volkswagen*, 444 U.S., at 292, 100 S. Ct., at 564).

manufacturer was neither fair, nor just, the holding does not go so far as to preclude the exercise of personal jurisdiction over a manufacturer who uses a national distributor. Based upon the foregoing discussion, as applied to a manufacturer, the stream-of-commerce theory supports the exercise of jurisdiction if the manufacturer knew or reasonably should have known of the distribution system through which its products were being sold in the forum state. *See, e.g.*, *Nelson by Carson*, 717 F.2d at 1126; *Noel v. S.S. Kresge Co.*, 669 F.2d 1150, 1155 (6th Cir. 1982); *Oswalt v. Scripto*, 616 F.2d at 200-01. It is the manufacturer's awareness of the distribution system that satisfies the requirement that the manufacturer have a reasonable expectation that its products will be purchased in the forum state. However, it makes no difference whether the manufacturer had actual or constructive knowledge of the distribution system. *Oswalt*, 616 F.2d at 200. A manufacturer that should have known, like one that actually knows, that its products will be sold in the forum state purposefully avails itself of the benefits of the forum's laws. *Id*. at 200-01.

By definition, a stream-of-commerce case involves a sale, not by the manufacturer, but by another entity in the chain of distribution. To be subject to the stream-of-commerce theory in some jurisdictions, the manufacturer must purposefully participate in or control the distribution of its products. *See Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137, 1144 (C.A. Ill. 1975); *Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co. (America) Inc.*, 499 F. Supp. 829, 842-43 (D. Or. 1980). We conclude, however, that a manufacturer need not control the distribution system in order to place its products into the stream of commerce and, therefore, control of that system is not necessary to subject the manufacturer to the jurisdiction of the forum state. *See Nelson by Carson*, 717 F.2d at 1126 n. 7. Rather, the focus should be on the manufacturer's actual or constructive awareness of the system, not on control of the distribution of its products. A manufacturer's establishment or control of a distribution system would, of course, satisfy the requirement that the manufacturer was aware of that distribution system.

A manufacturer's awareness of the distribution system, through which it receives economic and legal benefits, justifies subjecting the manufacturer to the jurisdiction of every forum within its distributors' market area. *Nelson by Carson*, 717 F.2d at 1126; *cf. World-Wide Volkswagen*, 444 U.S. at 297 (manufacturers should be subject to suit when they indirectly serve the market for their products). Accordingly, a manufacturer that intentionally seeks out a distribution system, with the goal of national distribution, should reasonably expect that its products could be sold throughout the fifty states and that it could be subject to the jurisdiction of every state. Our holding herein does not completely eradicate a foreign manufacturer's ability to insulate itself from personal jurisdiction in our State, however. If the foreign manufacturer attempts to preclude the distribution and sale of its products in the forum state, it may avoid the jurisdiction of the courts of that state (depending, of course, upon the specific facts of the case). *See Bean Dredging Corp. v.*

*Dredge Tech. Corp*., 744 F.2d 1081, 1085 (5th Cir. 1984); *Plant Food Co-op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 159 (9th Cir. 1980); *Oswalt v. Scripto*, 616 F.2d at 199-200; *Rockwell Int'l Corp*., 553 F. Supp. at 333. A manufacturer that prohibits the distribution of its products in a particular state would not reasonably expect its products to be sold in that state. Thus, the stream-of-commerce theory should not subject such a manufacturer to the forum state's jurisdiction in those instances.

The distribution system analysis has informed several decisions from our sister states. *Clune v. Alimak AB*, 233 F.3d 538 (8th Cir. 2000) involved a Swedish manufacturer that had designed construction hoists for the United States market. *Id.* A Missouri construction worker fell from one of the hoists and brought a wrongful death action in that state. The evidence reflected that the manufacturer had exclusive distribution agreements with United States distributors, and these distributors were a subsidiary of the manufacturer. The *Clune* court observed, "at minimum, [the manufacturer] had constructive knowledge that its construction hoists would end up in Missouri . . . ." *Id*. at 545. Thus, the court found that the Swedish manufacturer "did more than simply set a product adrift in the international stream of commerce. The record shows [the defendant] created the distribution system that brought the hoist to Missouri." *Id*. at 543. Based on these facts, the Eighth Circuit concluded that the manufacturer "purposefully directed its products to the United States through the distribution system it set up in this country." *Id*. at 544. The court explained, "[t]he company knew that by virtue of this system, its construction hoists entered Missouri," and the "creation of the system that brought hoists to Missouri established sufficient minimum contacts with that forum to satisfy the due process standards." *Id*. at 544-45. Moreover, the *Clune* court noted that:

> The record shows that [the Swedish manufacturer] did not seek to limit the states or regions where their construction hoists would be sold. Rather, it utilized distributors that had sales territories across the United States. A foreign manufacturer that successfully employs a number of regional distributors to cover the United States intends to reap the benefits of sales in every state where the distributors market. Similarly, a foreign manufacturer that successfully employs one or two distributors to cover the United States intends to reap the benefit of sales in every state where those distributors market. The difference is one of form, not function, and the practical effect is the same.
>
> We are not persuaded by [the manufacturer's] argument that it was unaware of what happened to its products after they left Swedish port. '[S]uch ignorance defies reason and could

aptly be described as "willful."' *Barone* [*v. Rich Bros. Interstate Display Fireworks Co.*], 25 F.3d [610,] 614 [(8th Cir. 1994)]. *See also id.* at 613 n. 4 (explaining how the distinction between what the defendant knew and should have known is immaterial to the personal jurisdiction analysis). If we were to conclude that despite its distribution system, [the manufacturer] did not intend its products to flow into Missouri, we would be bound to the conclusion that the company did not intend its products to flow into any of the United States.

*Clune*, 233 F.3d at 544. *Clune* does differ from the instant appeal in that the Swedish manufacturer's distributor, in *Clune,* was found to be a subsidiary of the Swedish manufacturer. However, as discussed in the authorities reviewed above, in the distribution system analysis, whether the middleman distributor of the foreign manufacturer's product is a subsidiary is not dispositive. Rather, it is the manufacturer's knowledge (constructive or actual) of what happens to its product when placed with a national distributor (i.e., that it will, in fact, be distributed nationally) that drives the question of personal jurisdiction.

*Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610 (8th Cir. 1994), a case relied upon by the *Clune* court, involved a Nebraska man, injured by fireworks, who sued the fireworks' foreign manufacturer. *Barone*, 25 F.3d 610. The Eighth Circuit held that, although the manufacturer had no office, agent, or distributor in Nebraska, did not advertise in Nebraska, and did not send any products into Nebraska, it was subject to personal jurisdiction because of the way its products arrived in that state. *Id*. at 615. The court observed that the manufacturer had strategically selected a network of distributors that could reach much of the United States. *Id*. After noting that the manufacturer used nine distributors in six states, the *Barone* court explained that the manufacturer's "strategic choice of distributors that could reach much of the country" was evidence of the manufacturer's efforts "to place its products in the stream of commerce throughout the Midwest[.]" *Id*. at 614. The *Barone* court concluded that "when a seller heads a distribution network it realizes the much greater economic benefit of multiple sales in distant forums, which in turn may satisfy the purposeful availment test." *Id*. at 613. *Barone* ultimately held that because the manufacturer "ha[d] reaped the benefits of its network of distributors ... it is only reasonable and just that it should now be held accountable in the forum." *Id*. at 615.

In *Mott v. Schelling & Co.* 966 F.2d 1453, 1992 WL 116014 (6th Cir. 1992), the court addressed a similar contention by a foreign manufacturer that the mere act of shipping a product to an independent distributor in the United States did not subject it to the court's exercise of personal jurisdiction. Under the facts of *Schelling*, a Michigan plaintiff was injured by a saw manufactured by Schelling & Company ("Schelling"), a foreign limited

partnership with its principal place of business in Austria. Schelling challenged the trial court's exercise of jurisdiction on the basis that its contacts with Michigan were insufficient, i.e., Schelling contended that it only sold the saw to a United States distributor in Alabama and that title to the saw passed to Proctor when it received the machine. In finding that Schelling was subject to the court's jurisdiction, the court found significant the fact that Schelling "knew its saws were being sold in the United States," that the company "actively cultivated its market here," taking into consideration United States standards in the design and manufacture of the saw, and that it "benefited from numerous U.S. sales." *Id*. The court further noted that Michigan had a "strong interest in exercising jurisdiction over Schelling," as the foreign company "placed its own product directly into the state of Michigan, albeit via Alabama." *Id*. Finally, the court found that Schelling could not avoid liability for the injuries caused by its product by "creating a paper transfer through a middleman," citing prior case law for the proposition that "'the use of an independent distributor so that the manufacturer is only indirectly responsible for the product reaching an injured customer, in and of itself, will not insulate [a] nonresident foreign corporation from suit.'" *Id*. (quoting *Poyner v. Erma Werke Gmbh,* 618 F.2d 1186, 1190 (6th Cir. 1980)).

Likewise, in *Tobin v. Astra Pharmaceutical Products, Inc*., 993 F.2d 528 (6th Cir. 1993), the court held that a Netherlands corporation, Duphar B.V. ("Duphar"), which submitted a new drug application for approval with the FDA and sought a distributor in the United States to exploit the American market, purposely availed itself of conducting business in the United States, thereby coming within Kentucky's long-arm statute and giving rise to personal jurisdiction. The court cited with approval the *Schelling* decision in holding that Duphar could not expect to rely solely upon the use of an independent distributor to insulate itself from suit. Rather, the *Tobin* court held:

> Duphar did not merely sell its product on the market with no direction in mind. Duphar directly submitted a New Drug Application to the FDA for approval, conducted clinical studies in the United States, and sought out a United States distributor to exploit the United States market. In this context, Duphar was not simply placing its product into the stream of commerce. Duphar purposefully availed itself of the privilege of conducting business in all states, including the state of Kentucky . . . .

*Tobin*, 993 F.2d at 544.

The reasoning of these opinions is not in conflict with the current law in Tennessee (*see, e.g., Davis Kidd*, *supra*) concerning stream of commerce in that they reflect the fact that a manufacturer must do "more than simply set a product adrift in the international stream of

-29-

commerce." ***Clune***, 233 F.3d at 543; ***Barone***, 25 F.3d at 615. Rather, personal jurisdiction in these cases was found only because those manufacturers expected their products to reach the forum through marketing networks that the manufacturer used with the expectation that their product(s) would find national distribution. In essence, the finding of purposeful availment under these cases, by virtue of the fact that the manufacturer's goal was to procure as much and varied distribution as it could through its choice of distributor, is in keeping with the ***World-Wide Volkswagen/ Asahi*** expectation standard, *see* discussion *supra*.

This issue of personal jurisdiction over a foreign manufacturer *vis a vis* the Escrow Fund Act has not been specifically addressed in Tennessee jurisprudence. However, we find guidance in two cases decided by our sister states. In ***State v. Grand Tobacco***, 171 Ohio App. 3d 551, 871 N.E.2d 1255 (2007), *perm. app. denied*, 114 Ohio St.3d 1426, 868 N.E.2d 680 (2007), the Ohio court found that a foreign tobacco product manufacturer had sufficient minimum contacts with Ohio such that the state could exercise personal jurisdiction over the company in order to enforce Ohio's escrow fund statutes. In ***Grand Tobacco***, the foreign manufacturer sold over 25 million units of its tobacco products in Ohio from 2000 to 2003. Moreover, Grand Tobacco took steps within the United States to trademark its products, to comply with federal regulations for the sale of cigarettes by submitting ingredient lists to the Center for Disease Control, and to distribute its products. Therefore, it had purposely availed itself of conducting business in all 50 states, including Ohio. Relying on the ***Tobin*** case, the ***Grand Tobacco*** court specifically held:

> [W]e find in the instant case that Grand Tobacco "did not merely sell its product on the market with no direction in mind." ***Tobin***, *supra*, at 544. Rather, it took specific actions . . . to market and sell its products in the United States, and Grand Tobacco's efforts to set in motion these events ultimately resulted in its products being sold in Ohio.
>
> We also find that the exercise of jurisdiction over Grand Tobacco would be fair and reasonable. Grand Tobacco has "shown its familiarity with the United States administrative and legal process" by undergoing the task of obtaining trademark protection and complying with federal regulations regarding the sale of cigarettes. ***Tobin***, 993 F.2d at 545 . . . . Further, as found by the trial court, the state of Ohio has an interest in enforcing its escrow statutes, and "to 'ensure that [states] will be able to recover healthcare costs from cigarette manufacturers regardless of whether the manufacturer has signed on to the Master Settlement Agreement.'" . . . . We thus agree with the trial court

that the exercise of personal jurisdiction over Grand Tobacco comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

*Grand Tobacco*, 871 N.E.2d at 1264 (some citations omitted).

In *State v. NV Sumatra Tobacco Trading Co.*, 666 S.E.2d 218, (S.C. 2008), a case that is nearly identical to the instant appeal, South Carolina brought an action under its escrow statutes against Sumatra (our Appellee and the Sumatra in the South Carolina case are the same entity). Sumatra alleged that it sold its products solely to a Singapore corporation, UNICO Trading Pte, Ltd. Sumatra admitted, however, that UNICO may have sold the cigarettes to a British Virgin Islands corporation, Silmar Trading Ltd. and that Silmar may have engaged a United States importer based in Florida for the purpose of selling tobacco products manufactured by Sumatra in the United States. Similar to *Clune* and *Barone*, the South Carolina Supreme Court applied the *World-Wide Volkswagen* "expectation" standard and concluded that Sumatra had sufficient minimum contacts with South Carolina based upon the following facts:

> (1) Sumatra admits it manufactured the United brand cigarettes; (2) Sumatra admits it owns the United States trademark for that brand; (3) the Department of Revenue states 6,868,000 United brand cigarettes were sold in South Carolina in 2001; (4) Sumatra, either on its own or by someone else on its behalf, filed an ingredient report for the United brand cigarettes with the Center for Disease Control; (5) Sumatra admits it packaged its cigarettes in packs and cartons which bear the United States-required health warnings; and (6) the United brand packaging identifies the cigarettes as an "American blend," has a Surgeon General's warning, and shows an eagle and striped packaging.

*Sumatra*, 666 S.E.2d at 223.

The exercise of personal jurisdiction is a very fact-specific enterprise. Consequently, in addition to the foregoing principles, before engaging in a minimum contacts analysis, it is important for courts to consider the nature of the product at issue in the case. "[T]he nature of the product may well have a bearing upon the nature and extent of the necessary minimum contacts." 18 *Fletcher Cyclopedia on the Law of Private Corporations* § 8640.40, *supra*. Specifically, where the defendant's business involves a highly regulated activity, it is more reasonable for the defendant to foresee having to litigate in a distant forum. *See*, *e.g.*,

***GRM v. Equine Inv. and Mgmt. Group***, 596 F. Supp. 307 (S.D. Tex. 1984) (citing ***Oxford First Corp. v. PNC Liquidating Corp***, 372 F. Supp. 191, 202 and n. 23 (E.D. Pa. 1974)).

The cigarette industry is highly regulated on both the federal and state level. Before selling their products in the United States, all tobacco product manufacturers must comply with a number of federal regulations, which include having their cigarette ingredients approved by the Centers for Disease Control, and complying with the FTC's packaging and warning rotation plan requirements. *See*, *e.g.*, 19 U.S.C. §§1681(a)(1) and (c)(1); 15 U.S.C. §1335(a). Cigarette sales are also highly regulated at the state level. Forty-six states, the District of Columbia, and five territories all have escrow laws, which require tobacco product manufacturers to place monies into escrow for each cigarette sold within that state.[10]

We now turn to the instant record to determine whether the specific facts of this case, in light of the foregoing principles, are sufficient to confer personal jurisdiction in Tennessee. In our analysis, we keep the ***Masada*** factors at the forefront of our inquiry. To reiterate, the three primary factors to be considered in determining whether the requisite minimum contacts are present are: (1) the quantity of the contacts, (2) their nature and quality, and (3) the source and connection of the cause of action with those contacts. Two lesser factors to be considered are: (4) the interest of the forum State and (5) convenience. ***Masada***, 697 S.W.2d at 334.

## B. Analysis

### 1. Quantity of the contacts.

---

[10] *See* Ala. Code 1975 §6-12-1; Alaska Stat. §§45.53.010 through 45.53.100; Ariz. Rev. Stat. Ann. §44-7101; Ark. Stat. Ann. §§ 26-57-260-261; Cal. Health & Safety Code §§ 104555-104557; Colo. Rev. Stat. §§39-28-201-203; Conn. Gen. Stat. Ann. §§ 4-28h-j; Del. Code Ann. Title 29, §§ 6080-6082; 1999 D.C. Stat. §6-201.1; 1999 D.C. Stat. § 6-920.1; Ga. Code Ann. §§ 10-13-1-3; Haw. Rev. Stat. §§ 675-1-3; Idaho Code §§ 39-7801-7803; Ill. Ann. Stat. ch. 30, §§ 168/5 through 168/15; Ind. Code §§ 23-3-3-1 through 24-3-3-13; Iowa Code Ann. §§ 453C.1-C.2; Kan. Stat. Ann §§ 50-6a01-6a03; Ky. Rev. Stat. Ann. §§ 131.600-602; La. Rev. Stat. Ann. §§ 13:5061-13:5063; Me. Rev. Stat. Ann. tit. 22 §§ 1580-G-I; Chapter 169, Laws of MD; Mass. Gen. L. ch. 94E, §§ 1-2; Mich. Comp. Laws Ann. §§ 445.2051-2052; Mo. Ann. Stat. §§ 196.1000-1003; Mont. Code Ann. §§ 16-11-401-403; Neb. Rev. Stat. §§ 69-2701-2703; Nev. Rev. Stat. Ann. §§ 370A.020-150; N.H. Rev. Stat. Ann. §§ 78:33 and 541-C:1-C:3; N.J. Stat. Ann. §§ 52:4D-1-3; N.M. Stat. Ann. §§ 6-4-12-13; N.Y. Public Health Laws §§ 1399-nn-pp; N.C. Gen. Stat. §§ 66-290-291 and 105-113.4C; N.D. Cent. Code §§ 51-25-01-02; Ohio Rev. Code Ann. §§ 1346.01-.02; Okla. Stat. Ann. tit. 37, §§ 600.21-.23; Or. Rev. Stat. §§ 293.530-.535; Pa. Cons. Stat. Ann. §§ 5672-5674; R.I. Gen. Laws §§ 23-71-1-3; S.C. Code Ann. §§ 11-47-10-30; S.D. Codified Laws §§ 10-50B-1-8; Tenn. Code Ann. §§ 47-31-102-103; Utah Code Ann. §§ 59-22-201-203; Vt. Stat. Ann. tit. 33, §§ 1912-1914; Va. Code §§ 3.1.336.1-.2; Wash. Rev. Code Ann. §§ 70.157.005-.020; W. Va. Code §§ 16-9B-1-3.

It is undisputed that, through intermediaries, Sumatra sold over 11.5 million cigarettes in Tennessee over a three-year period. Moreover, because Sumatra is a foreign manufacturer, it had numerous national contacts in order to distribute its product in the United States market. Sumatra hired attorneys in the United States to complete requirements related to the sale of the United brand cigarettes. As discussed above, Sumatra filed three trademark applications with the United States Patent and Trademark Office for its United brand. In each of these applications, Sumatra affirmatively stated that it intended to use the mark in United States commerce. These statements were signed by Sumatra's Executive Director, Timin Bingei. Furthermore, Sumatra filed its ingredient list for the United brand with the Office of Health and Human Services and sought approval for those ingredients for the calendar years 2000-2001. Sumatra then packaged its cigarettes at its Indonesia manufacturing facility with the required labeling for cigarettes sold in the United States and filed a statement consenting to have its products imported into the United States stream of commerce.

In order to distribute its products nationally, Sumatra had a working relationship with FTS. According to the record, Sumatra had at least an oral agreement with FTS, whereby FTS would serve as Sumatra's exclusive distributor in the United States. FTS and Sumatra corresponded through facsimile and telephone calls, by which FTS would place orders for the United brand cigarettes. The relationship between FTS and Sumatra went beyond merely placing orders, however. The two companies corresponded concerning issues that arose regarding the packaging of the United brand and regarding the MSA and/or the escrow requirements of the various states in which United brand cigarettes were sold (including Tennessee). Sumatra representatives traveled to Beijing, China, and possibly to Miami, Florida, to meet with representatives of FTS concerning the national distribution of United brand cigarettes. At these meetings, representatives of both companies discussed issues such as whether Sumatra should join the MSA or remain a non-participating member. The parties also discussed Sumatra's desire to distribute its United brand products to all fifty states.

As demonstrated by bills of lading and invoices, Sumatra intentionally directed shipments of the United brand cigarettes to FTS in Miami, Florida, with the purpose of having those cigarettes distributed throughout the United States market. From the record, Sumatra took no steps to exclude Tennessee from its distribution system. In fact, Mr. Battah, of FTS, testified that the goal was to sell one thousand master cases of United brand cigarettes in every state. To this end, Sumatra provided FTS with promotional materials to distribute throughout the various markets.

**2. Nature and quality of the contacts.**

There is no dispute that Sumatra manufactured the United brand cigarettes that were

sold in Tennessee. On or before July 24, 2001, the record indicates that Sumatra was aware that its cigarettes would "be purchased in California, Washington, Texas, Arizona, Louisiana, Mississippi, Georgia, North Carolina, South Carolina, New Hampshire, Oklahoma, **Tennessee**, and Kentucky." (Emphasis added). Moreover, Sumatra acknowledged receipt of "notice from the Office of the Attorney General in the 46 states subject to escrow such as **Tennessee**, New Hampshire, California, Pennsylvania, etc. to request confirmation whether [Sumatra's] cigarettes were sold in [these] states and whether [Sumatra has] opened an account related to the escrow fund." (Emphasis added). As set out above, Sumatra further acknowledged that it was made aware that, if it believed that it was not subject to the requirements of the Escrow Fund Act, it was required to send a written explanation in lieu of a completed certificate, or risk civil action by the Office of the Attorney General.

As evidenced by the number of United brand cigarettes sold in the United States (and particularly in Tennessee), Sumatra intentionally sought distribution of its United brand cigarettes in the largest quantities and to the most markets it could reach through its national distribution system. All evidence indicates that Sumatra was not a complacent beneficiary of this national distribution system; rather, Sumatra specifically sought out the system with the knowledge that it would ensure large-scale distribution of its products in the United States market. The distribution system was purposefully used by Sumatra toward this end, and all evidence indicates that the distribution system chosen by Sumatra was efficacious. Of course, in deciding whether personal jurisdiction is proper in Tennessee, we are concerned primarily with the question of whether Sumatra's use of this distribution system supports a finding that Sumatra purposefully availed itself of the Tennessee market so as to reasonably anticipate being haled into court here. From the record, the economic impact of United brand sales in Tennessee is neither insignificant nor incidental.

As noted above, in a three-year period, Sumatra sold over 11.5 million of its United brand cigarettes in Tennessee. The quantity of units sold preponderates in favor of a finding that the arrival of United brand cigarettes in Tennessee was not the result of happenstance. These sales account for over 575,000 packs of United brand cigarettes sold in Tennessee. Moreover, under the Escrow Fund Act, the sale of Sumatra's cigarettes in Tennessee, during 2000-2002, account for over $100,000 in cigarette excise tax revenue. Tenn. Code Ann. § 67-4-1004 (assessing the cigarette tax at 6.5 mills per cigarette (the rate during the relevant period)).[11]

---

[11] Subsequent to the accrual of the instant cause of action, Tennessee Code Annotated Section 67-4-1004 was amended, in relevant part, as follows:

2002 Pub. Acts, c. 856, §§ 1(e) and 1(f), in subsec. (a), substituted "ten (10) mills" for "six and one-half (6
(continued...)

It is important to note that the instant case differs from the standard products liability case because this is not a case where the manufacturer shipped out a large quantity of its product with the expectation that only a small percentage of that product might be defective and potentially subject them to liability. Here, each cigarette sold into a MSA-participating state, of which there are 46, *see supra* fn. 10, would subject Sumatra to escrow liability in that state. Consequently, Sumatra should have reasonably anticipated that it could be haled into court in any of the states where its cigarettes were sold, including Tennessee.

In *Tobin*, 993 F.2d 528, the Sixth Circuit found liability against a foreign manufacturer, and specifically "found significant the fact that the United States standards were taken into account in the design and manufacture of the [product] at issue." *Tobin*, 993 F.2d at 544. As discussed above, Sumatra followed all United States product standards when it manufactured the United brand cigarettes, and furthermore availed itself of the laws of the United States in selling its products here. In a similar case, *State of Ohio v. Bulgartabac Holding Group*, No. 07AP-177, 2007 WL 4395514, at *5 (Ohio Ct. App. Dec. 18, 2007), the Ohio Court of Appeals held that jurisdiction over a foreign tobacco manufacturer was proper. In reaching its decision, the court explained that the manufacturer, Bulgartabac, "took steps to ensure compliance with United States law regarding cigarette packaging . . . . Bulgartabac purposely availed itself of the privilege of conducting business within all of the states, including Ohio, such that the exercise of personal jurisdiction over the company would not violate due process." *Id*.

From the foregoing undisputed facts, it is clear that Sumatra did more than merely place its product into the stream of commerce. In addition to placing the United brand cigarettes into the United States stream of commerce, the record shows that Sumatra also intentionally decided to market its product nationwide with the goal of mass distribution to

---

[11](...continued)
1/2) mills", added subsec. (c), relating to the deposit of increased revenue, and added subsec. (d), relating to dealers possessing cigarette tax stamps as of the effective date for this section, July 15, 2002.

2007 Pub. Acts, c. 368, § 1, in subsec. (a), substituted "three cents (3¢)" for "ten (10) mills", § 2 rewrote subsec. (c), and § 4 added subsec. (d), relating to additional cigarette tax. Subsec. (c) formerly read:

> (c) Any wholesale dealers, jobbers, tobacco distributors, and retail dealers having cigarette tax stamps, affixed and unaffixed, in their possession on July 15, 2002, shall not be required to pay the additional cigarette tax on such stamps resulting from the increase in tax rate from six and one-half (6 1/2 ) mills to ten (10) mills on cigarettes bearing such stamps.

all fifty states. *See, e.g., Asahi*, 480 U.S. at 111. Like the foreign manufacturer in ***Tobin***, *supra*, Sumatra "sought and obtained a distributor to market its product in each and every state." 993 F.2d at 544. Moreover, Sumatra was aware of the fact that its chosen distribution system was very likely to result in Sumatra's products being sold in every state, and, in fact, this was Sumatra's goal. Furthermore, Sumatra took no steps to exclude Tennessee from selling its products so as to evidence an intent to limit its distribution market in any way. In fact, Sumatra did just the opposite in seeking to distribute its product into all fifty states.

In ***McCombs v. Cerco Rentals***, 622 S.W.2d 822, 827 (Tenn. Ct. App. 1981), this Court held that a Tennessee court could exercise personal jurisdiction over a French manufacturer. In ***McCombs***, the manufacturer's only connection with Tennessee was that one of its cranes entered this country through the manufacturer's wholly-owned subsidiary and was sold to an independent middleman that leased the crane to a Tennessee corporation for use in Tennessee, where the damage occurred. 622 S.W.2d at 824. Like the French crane manufacturer in ***McCombs***, Sumatra's product entered the State of Tennessee through a chain of distribution, which was initiated by Sumatra. In both cases, the manufacturer of the product initiated the distribution system in order to achieve wider distribution in the United States.

### 3. Source and connection of the cause of action with Sumatra's contacts.

It is undisputed that Sumatra is a non-participating manufacturer under the MSA, which renders the company liable for escrow payments based upon the number of its cigarettes sold within the State of Tennessee. Tenn. Code Ann. § 47-31-103(a). It is also undisputed that Sumatra is a tobacco product manufacturer as defined at Tennessee Code Annotated Section § 47-31-102(9)(A), *supra*. Because the instant lawsuit arises out of Sumatra's failure to make appropriate escrow deposits, as required under the Act, the lawsuit is directly tied to Sumatra's contacts with Tennessee (i.e., it was the sale of tobacco products in Tennessee that led to Sumatra's escrow obligations). By "injecting its product" into the stream of national commerce, through which the product was eventually, and in the normal chain of distribution, sold to Tennessee consumers, Sumatra at least "indirectly availed itself of the laws of Tennessee...and therefore[,] the cause of action arises directly from the intended use of that product in Tennessee." ***McCombs***, 622 S.W.2d at 827.

### 4. The State's interest in adjudicating this dispute.

The State of Tennessee's interest in adjudicating this dispute against Sumatra is compelling. As a non-participating manufacturer under the MSA, Sumatra is obligated to deposit monies into an escrow account pursuant to the Escrow Fund Act. According to the record, Sumatra's unpaid escrow obligations for the years 2000 through 2002 were:

$14,941.82 for sales in 2000; $143,262.09 for sales in 2001; and $10,112.92 for sales in 2002. Under the Act, the State of Tennessee may only collect this escrow obligation from the tobacco product manufacturer (i.e., Sumatra). If Tennessee cannot exercise personal jurisdiction over Sumatra, then these escrow balances remain unpaid despite the uncontested fact that a significant number United brand cigarettes were sold in Tennessee.

In addition to the State's financial interest and the fact that this interest may only be pursued against the tobacco product manufacturer, the State also has a heightened interest in this case because the Escrow Fund Act was enacted pursuant to the State's police power. *See Star Scientific, Inc. v. Beales*, 278 F.3d 339, 349 (4th Cir. 2002) (citing *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) and *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co*, 335 U.S. 525, 536 (1949)). The State also has an interest in protecting its citizens and in enforcing the important social policies that form the basis for the Escrow Fund Act. As set out in the Model Escrow Fund Act, which was included as an attachment to Sumatra's statement of undisputed facts, these policies include, but are not limited to: (1) the public health concern presented by cigarette smoking and the ensuing financial concerns and burden placed upon the state's health-care programs; (2) the state's interest in having the tobacco product manufacturers, rather than the state, bear the financial burden caused by smoking; (3) the state's interest in having tobacco product manufacturers make substantial changes to their advertising and marketing practices and their corporate culture to reduce underage smoking; (4) the state's interest in not having a loophole, whereby a tobacco product manufacturer who chose not to enter into the MSA could avoid liability while deriving large, short-term profits in the years before liability may arise (i.e., diseases caused by tobacco use often do not appear until many years after smoking begins).

Moreover, many courts, including Tennessee, have found that the Escrow Fund Act serves a legitimate purpose. *See, e.g., S & M Brands, Inc. v. Summers*, 393 F. Supp. 2d 604, 633 (M.D. Tenn. 2005); *South Carolina v. Sumatra*, 663 S.E.2d at 223. In the South Carolina Sumatra case, the court found significant the fact that the Department of Revenue reports indicated that 6,868,000 United brand cigarettes were sold in South Carolina in 2001. *Id*. at 221. The record in this appeal indicates that, in the same year (i.e., 2001), more than 9,000,000 United brand cigarettes were sold in Tennessee.

## 5. Convenience of the parties.

As discussed in detail above, due process requires that individuals have "fair warning" that a particular activity may subject them to jurisdiction in a particular forum. *Burger King*, 471 U.S. at 471-72. As we concluded above, the volume of United brand products that were sold in Tennessee in 2000, 2001, and 2002 indicate that Sumatra's conduct in distributing its products was not random or attenuated. Rather, Sumatra

knowingly and intentionally injected its tobacco products into the United States stream of commerce and targeted the entire United States market. Sumatra did nothing to limit the distribution of its product, and specifically did not limit its distribution to exclude Tennessee. Rather, Sumatra used a nationwide distributor to ensure that its products followed national specifications so that it could be distributed into every state, including Tennessee. Consequently, we conclude that Sumatra could reasonably anticipate being haled into court in Tennessee, where 11,500,000 of its tobacco products were sold in a three-year period. Under the facts of this case, Sumatra cannot show that it was ignorant of the distribution system it chose, nor can it plead unwitting distribution to the Tennessee market when the evidence shows that Sumatra's goal was distribution to every state, including Tennessee.

Sumatra claims that it would be inconvenient for it to travel to Tennessee to defend this case. When exercising jurisdiction over Sumatra in South Carolina, the Supreme Court of South Carolina addressed the issue of convenience of the forum. *South Carolina v. Sumatra*, 666 S.E.2d at 223. Although Sumatra had no offices or agents in South Carolina, just as it has no offices or agents in Tennessee, the South Carolina court reasoned that, "[w]hile it may be inconvenient for [] Sumatra to travel to the United States to defend the action against it, the State's interest in exercising jurisdiction outweighs any such inconvenience. The State has a valid interest in protecting itself against any suits that arise from a person smoking the United brand of cigarettes." *Id*. The same is true in the instant case.

As discussed in detail above, Sumatra knew that it could face litigation by the attorney general of any state where its products were sold and which required payment into an escrow fund account. Sumatra knew that its cigarettes were sold in Tennessee and that Tennessee had an escrow requirement. Sumatra also expressed concern that it might, in fact, be sued in jurisdictions, including Tennessee, that had enacted escrow fund legislation. It is disingenuous, therefore, for Sumatra to now claim that Tennessee is an inconvenient forum.

### 6. Conclusion

For the foregoing reasons, we conclude that Sumatra cannot escape jurisdiction in Tennessee because it targeted the entire United States without any limitation as to where its product could be sold. *See Tobin*, 993 F.2d 528; *McCombs*, 662 S.W.2d 822. Sumatra followed all applicable United States product standards when manufacturing its tobacco products. It intentionally chose a distribution system, whereby its tobacco products would be marketed and sold in all fifty states, including Tennessee, without limiting distribution in any state. Sumatra benefitted financially from the sale of its products in Tennessee such that it would be unfair to allow Sumatra to escape having to account for the consequences that

may arise from those activities. The "fairness requirements of due process do not extend so far as to permit a manufacturer to insulate itself from the reach of the forum's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products." *DeJames v. Magnificence Carriers*, 654 F.2d 280, 285 (3d Cir. 1981). Under the facts of this case, we conclude that exercising personal jurisdiction is in keeping with the Tennessee long-arm statutes' goal of expansive coverage within the confines of the Due Process and Equal Protection Clauses. Moreover, the State's interest in enforcing its Escrow Fund Act, and in protecting both its citizens and its pecuniary interests weigh in favor of a finding of personal jurisdiction over Sumatra. Finally, because Sumatra should have anticipated being haled into court in Tennessee, and in light of the fact that Sumatra sold some 11,500,000 units in this State, we conclude that Tennessee is the most convenient forum for this lawsuit and that it does not violate the notions of fair play and substantial justice to require Sumatra to answer in a Tennessee court.

For the foregoing reasons, and based upon our conclusion that personal jurisdiction over Sumatra is proper and within the authority of our long-arm statutes, we reverse the trial court's grant of summary judgment in favor of Sumatra for lack of personal jurisdiction.

## SUMMARY JUDGMENT

Having determined that the exercise of personal jurisdiction is proper under the particular facts of this case, we now turn to the State's second issue to determine whether summary judgment should be granted in its favor. As discussed above, the State filed a cross-motion for summary judgment in this case. The applicable law concerning a trial court's grant or denial of summary judgment, and this Court's standard of review on appeal is discussed in detail above. In addition to those well-settled principles, we note that "neither element of summary judgment is waived merely because both parties have moved for summary judgment. Each party moving for summary judgment has the burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Blue Bell Creameries, LP v. Roberts*, 333 S.W.3d 59, 64 (Tenn. 2011) (relying on *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 83 (Tenn.2010)).

Because we have determined that there is no dispute of material fact in this case such as to preclude the grant of summary judgment, the issue of whether the State is entitled to summary judgment is a question of law. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Specifically, the issue is two-fold. First, we must determine whether Sumatra is subject to Tennessee's Escrow Fund Act. Based upon Sumatra's affirmative defenses, we must then determine whether the Escrow Fund Act is constitutional so that it may be enforced.

### A. Applicability of the Escrow Fund Act.

In November 1998, Tennessee, along with a number of other states, entered into the MSA with several major tobacco companies.[12]  Under the MSA, the tobacco companies agreed to pay an estimated $4.8 billion to the State of Tennessee through the year 2025 and additional payments thereafter in perpetuity.  In addition to monetary relief, the MSA provides the State with other relief, including: (1) a ban on youth targeting in marketing and advertising (MSA § III(a)); (2) a ban on the use of tobacco company sponsorships (MSA §III(c)); (3) a ban on outdoor advertising (MSA § III(d)); (4) restrictions on free sample give-aways (MSA § III(h)); and (5) the creation of a foundation that will conduct anti-smoking campaigns and make grants to state and local governmental entities for the same purpose (MSA § VI).  The MSA also sets forth a proposed model escrow act for all settling states (i.e., those that have joined the MSA) to adopt.  As mentioned above, adoption of the proposed model escrow act would serve several purposes, including public health reasons, financial concerns to the state caused by cigarette smoking, and to prevent tobacco manufacturers from avoiding liability.  Tennessee adopted the Escrow Fund Act on May 26, 1999.

### 1.  Tobacco product manufacturer requirement.

The Escrow Fund Act defines a "tobacco product manufacturer" as "[a]n entity that . . . manufacturers cigarettes anywhere . . . [and] intends [those cigarettes] to be sold in the United States, including cigarettes . . . sold . . . through an importer." Tenn. Code Ann. § 47-31-102(9)(A)(i).  Under the plain language of this definition, there can be no dispute that Sumatra is, in fact, a tobacco product manufacturer.

It is undisputed that Sumatra manufactured the United brand cigarettes at its facility in Indonesia.  It is also undisputed that Sumatra intended those cigarettes to be sold in the United States and that it obtained a United States trademark in order to sell its product in any state.  The record indicates that Sumatra intentionally entered into a distribution system that would help to accomplish its goal of distribution to every state.

### 2.  Sumatra sold cigarettes in Tennessee.

As a non-participating tobacco products manufacturer, under the MSA, Sumatra is liable for escrow payments based upon the number of units sold with the State of Tennessee, Tenn. Code Ann. §§ 47-31-102(2) and 103(a)(2)(A), and is also required to file an annual certification of compliance with the Attorney General.  Tenn. Code Ann. §47-31-103(a)(3).

---

[12]  The complete Master Settlement Agreement is available online at http://www.naag.org/backpages/naag/tobacco/msa.

As previously discussed, licensed distributor reports, which were filed with the State of Tennessee between January 1, 2000 and December 31, 2002, show that over 11.5 million United brand cigarettes were stamped for sale in Tennessee during that time period. From the undisputed evidence, it is clear that Sumatra, a tobacco product manufacturer, did, in fact, sell its products in Tennessee. Consequently, under the statutory scheme, Sumatra owes escrow funds in Tennessee.

### 3. Sumatra did not pay into the Tennessee Escrow Fund Act.

It is undisputed that Sumatra failed to deposit any monies in compliance with the Act. The record shows that, for the years in question, Sumatra owed approximately $170,000 in escrow funds. Despite correspondence from Tennessee to Sumatra on March 21, 2001, May 7, 2001, and April 4, 2002, informing Sumatra that it had an escrow obligation in Tennessee, Sumatra failed to comply with the Act.

Having determined that Sumatra is subject to personal jurisdiction in Tennessee, that it is obligated, under the plain language of the Act, to pay into the escrow fund as a non-participating tobacco product manufacturer, and that it has failed to make these required payments, we now turn to the question of whether Sumatra's affirmative defenses should bar the State's ability to enforce the Act against Sumatra.

### B. <u>Affirmative Defenses</u>

Sumatra has raised numerous affirmative defenses to the State's amended complaint. On Sumatra's motion, the trial court struck all of the affirmative defenses, except those related to the State constitution and, obviously, the claim of lack of personal jurisdiction. No issue has been raised concerning the trial court's action *vis-a-vis* Sumatra's affirmative defenses, with the exception of personal jurisdiction, which we have adjudicated. Consequently, we are left with only those claims involving the constitutionality of the Act. Specifically, Sumatra raised the following defenses concerning the Act's constitutionality, arguing that the Escrow Fund Act: (1) "is unconstitutional in that it denies Defendant equal protection of the law and due process of the law as guaranteed by the Tennessee Constitution"; (2) "violates the Tennessee Constitution, Article II, Section 1, which bars the executive branch from exercising the legislative authority of state government"; and (3) "is unconstitutional as it constitutes a 'taking' of the property of Defendant without just compensation in violation of the Tennessee Constitution, Article I, Section 21."

In the first instance, the MSA and state tobacco escrow law, including Tennessee's Escrow Fund Act, have been subjected to numerous constitutional and statutory challenges, particularly under the Due Process and Equal Protection Clauses. *See S & M Brands, Inc.*

*v. Summers*, 393 F. Supp. 2d 604, 621-637 (M.D. Tenn. 2005) (upholding Tennessee's escrow statute and related tobacco laws against challenges under the Sherman Act, Due Process and Equal Protection Clauses), *aff'd*, ***S & M Brands, Inc. v. Summers***, No. 05-5148, 2007 WL 1175630 (6th Cir. April 19, 2007). Other states have overwhelmingly held that state escrow fund statutes do not violate either their respective state or the federal constitutions. *See **Star Scientific v. Beales***, 278 F.3d 339, 351-52 (4th Cir. 2002) (finding no violation of Due Process or Equal Protection Clauses); ***Grand River Enters. Six Nations, Ltd. v. Pryor***, 425 F.3d 158, 175 (2d Cir. 2005) (holding that the escrow statute did not deprive non-participating members equal protection of the law because the statute is rationally related to legitimate state interests, including promotion of health and recovery of costs for tobacco-related illnesses); ***Grand River Enters. Six Nations, Ltd. v. Beebe***, 418 F.Supp. 2d 1082 (W.D. Ark. 2006) (finding no violation of Due Process or Equal Protection Clauses); ***Xcaliber Int'l Ltd., LLC v. Kline***, No. 05-2261-JWL, 2006 WL 288705 (D. Kan. Feb. 7, 2006) (finding no violation of Due Process clause); ***K T & G Corp. v. Attorney General of the State of Okla.***, 535 F.3d 1114 (10th Cir. 2008) (finding no violation of Due Process or Equal Protection Clauses); ***PTI, Inc. v. Philip Morris, Inc.***, 100 F. Supp. 2d 1179 (C.D. Cal. 2000) (finding no violation of Due Process or Equal Protection Clauses). We decline Sumatra's request to hold against the overwhelming majority of case law finding escrow fund acts, including the Tennessee Escrow Fund Account, to be constitutional under both due process and equal protection analysis.

In addition to due process and equal protection considerations, Sumatra also argues that the Escrow Fund Act presents an unconstitutional exercise of legislative authority by the executive branch of the State. Sumatra's argument is difficult to discern given the fact that the Escrow Fund Act was enacted by the Tennessee General Assembly and the only executive functions under the statute are to receive certifications and to enforce compliance. Tenn. Code Ann. § 47-31-103(a)(3)(A) ("The attorney general and reporter may bring a civil action on behalf of the state against any tobacco product manufacturer that fails to place into escrow the funds required under this section."). Moreover, Tennessee courts have routinely upheld the exercise of executive power against challenges under the Tennessee Constitution, Article 2, Section 1. *See, e.g., **Plasti-Line, Inc. v. Tenn. Human Rights Comm'n***, 746 S.W.2d 691 (Tenn. 1988) (finding that Tennessee Human Rights Commission's power to resolve disputes did not violate separation of powers); ***Bank of Commerce & Trust Co. v. Senter***, 260 S.W. 144, 150-51 (Tenn. 1924) ("Statutes enacted by the legislative department are not self-executory. To become effective they must feel the touch of human energy, which the administration alone can supply, and this element so essential to the efficiency of all law has never been regarded as an unauthorized delegation of legislative directive.").

Sumatra also argues that the Act is an unconstitutional "taking" of Sumatra's property, without just compensation. We disagree. The provisions of the Tennessee Constitution,

Article I, Section 21 apply to governmental taking of property. *See Far Tower Sites, LLC v. Knox County*, 126 S.W.3d 52, 69 (Tenn. Ct. App. 2003). In order to show violation of this section of our constitution, a defendant must identify the "property" it claims is being taken from them without due process or just compensation. *See, e.g., Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002); *Ohio Student Loan Comm'n v. Cavazos*, 900 F.2d 894, 898-99 (6th Cir. 1990).

In *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Supreme Court determined that a government-imposed obligation to pay money did not constitute a taking. "This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to a third party." *Id*. at 554; *see also Smith v. Cortes*, 879 A.2d 382, 385-86 (Pa. Commw. Ct. 2005) (holding that the mere obligation to pay money does not constitute a taking). In the instant case, there is no evidence to suggest that the State has deprived Sumatra of any property interest in enacting the Escrow Fund Act, or by otherwise entering into the MSA. Consequently, this defense is without merit. *See Temple v. State of Tennessee*, No. 3:00-0126, 2002 WL 490826, at *3 (M.D. Tenn. March 22, 2002).

Sumatra's other affirmative defense involves a claim that the Escrow Fund Act unconstitutionally "benefits" a narrow class of individuals. In *Mass Mutual Life Insurance Co. v. Vogue, Inc.*, 393 S.W.2d 164 (Tenn. Ct. App. 1965), this Court upheld regulations that treated life insurance policies in a manner different from other corporate assets. We specifically held that "[t]he constitutional provisions against class legislation apply only when the statutory classification bears no reasonable or natural relation to the object sought to be accomplished." *Id*. at 166. We further noted that, "[c]onsistently, the courts in cases too numerous to cite have sanctioned legislative classifications relating to various and sundry types of business and professional activities, ranging from the business of lending money . . . to the regulation of the sale of new and used automobiles . . . ." *Id*. Similarly, the escrow statutes' distinction between non-participating and participating manufacturers has been upheld as a rational classification. *S & M Brands*, 393 F. Supp. 2d at 636 ("[w]hile it is true that the Escrow Act distinguishes among tobacco product manufacturers on the basis of whether they have or have not chosen to enter into the MSA, that distinction is rationally related to Tennessee's legitimate purpose of ensuring a source of recovery from *all* manufacturers for Tennessee's potential future costs related to cigarette smoking") (emphasis in original); *see also Grand River Enters.*, 425 F.3d at 175 (holding that the escrow statute did not deprive non-participating members of equal protection of the law because that statute is rationally related to legitimate state interest, including promotion of health and recovering costs for tobacco-related illnesses).

Based upon the foregoing discussion, we conclude that Sumatra's remaining

affirmative defenses lack merit.  Consequently, these defenses do not bar the State from recovery under the Escrow Funds Act.

For the foregoing reasons, we reverse the trial court's order granting summary judgment in favor of Sumatra for lack of personal jurisdiction.  We remand the case for entry of summary judgment in favor of the State, and specifically for determination of the amount of escrow funds owed by Sumatra.  Costs of this appeal are assessed against the Appellee, NV Sumatra Tobacco Trading Company, for which execution may enter if necessary.

_____
J. STEVEN STAFFORD, JUDGE